# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 8, 2022          Decided August 15, 2023

No. 21-1214

VISTRA CORP.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

OFFICE OF THE PEOPLES COUNSEL FOR THE DISTRICT OF
COLUMBIA, ET AL.,
INTERVENORS

———

Consolidated with 21-1216, 21-1217, 22-1063, 22-1065,
22-1066

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*Paul W. Hughes* argued the cause for petitioners. With him on the briefs were *Nicholas M. Gladd, Valerie L. Green, Matthew E. Price, Zachary B. Cohen, Neil L. Levy, David G. Tewksbury*, and *Andrew A. Lyons-Berg*.

2

*Paul M. Flynn* argued the cause for intervenor PJM Interconnection, L.L.C. in support of petitioners. With him on the brief was *Ryan J. Collins.*

*Matthew W. Estes*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, *Robert H. Solomon*, Solicitor, and *Matthew J. Glover*, Attorney.

*Jeffrey W. Mayes* argued the cause for intervenors Monitoring Analytics, LLC, et al. in support of respondent. With him on the brief were *Robert A. Weishaar, Jr., Kenneth R. Stark, Regina A. Iorii, Anjali G. Patel, Karen R. Sistrunk,* and *William F. Fields.*

Before: MILLETT and CHILDS, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* CHILDS.

CHILDS, *Circuit Judge*: Vistra Corporation, joined by several other electricity suppliers, petitions this Court to review three underlying orders of the Federal Energy Regulatory Commission. These orders involve the sale of electricity in capacity markets. Generally, in such markets, electricity companies like the ones before us commit to producing electricity at some agreed-to point in the future if demand so requires. In return, the companies make money from the commitment and are compensated for the costs associated with participating in the market. The capacity market at issue here, managed by PJM Interconnection, LLC, has been in place since 2006. Nonetheless, in response to periodic concerns, the Commission has adjusted the market's features to ensure that it remains competitive.

3

In 2021, following complaints from an independent monitor and a group of state regulators, the Commission determined that a problem existed with a key feature of the PJM capacity market then in place. That feature allowed suppliers to submit offers in PJM's market based on a default offer cap as an alternative to an individualized assessment of the cost of delivering capacity; offers that fell at or below this market-wide cap were admitted and deemed competitive. The Commission found that a certain number used to calculate the default offer cap—specifically, to estimate the duration of time a supplier might be called to perform during an emergency—was too high, thus making the resulting default offer cap too high as well. To fix the problem, the Commission adopted a proposal from the independent monitor. This proposal called for relying on individualized calculations, known as unit-specific review, in place of a default offer cap that could be applied to all market entrants. Some suppliers, who preferred to recalibrate the default offer cap rather than discard it, unsuccessfully objected.

Vistra and accompanying suppliers (collectively, Petitioners) bring to us three arguments challenging the discontinuance of the default offer cap. First, Petitioners assert that the decision to discard the default offer cap was arbitrary and capricious because the Commission failed to explain its reasons for doing so. Second, Petitioners tell us the Commission failed to account for certain risks undertaken by suppliers, risks that suppliers believe must be compensated. Third, Petitioners contend that the Commission's decision infringes upon their rights to set their own rates under Section 205 of the Federal Power Act. *See* 8 U.S.C. § 824d. Upon review of the petition and the record, we are unconvinced.

4

The Commission adequately explained its choice to rely on unit-specific review rather than a default offer cap, including that Petitioners' recalibrated alternative would not have sufficiently mitigated anti-competition concerns. The Commission also addressed its accounting of the risks associated with acquiring a capacity commitment, risks that it explained are limited to participation in a capacity market. Finally, Petitioners' Section 205 rights remain intact. The Commission reasonably interpreted supplier offers in capacity markets to be merely inputs into obtaining the market-clearing price. These inputs are not the ultimate rates that come out of the market, which are, in turn, subject to Section 205.

Petitioners earnestly desire a different result, but we cannot grant it. Our role in this administrative scheme is limited to checking that the Commission has rationally explained the basis for its decisions and considered the relevant evidence and arguments before it. It has done so here. Accordingly, we deny these petitions.

**I**

**A**

**1**

The Federal Power Act confers upon the Commission authority to regulate the generation of electricity and the transmission and sale of that electricity in interstate commerce. 16 U.S.C. § 824(a)–(b)(2). To fulfill its duty, the Commission must "oversee all prices for those interstate transactions and all rules and practices affecting such prices." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 266 (2016). This oversight remains ever concerned about energy suppliers exerting market power, which is the ability of an energy

5

supplier "with a large market share to significantly control or affect [the] price" of energy.  Fed. Energy Regul. Comm'n, *Glossary*, https://perma.cc/4GVC-ZE7X (last updated Aug. 31, 2020).

As relevant to these petitions, Section 205 of the Federal Power Act grants the Commission jurisdiction over "[a]ll rates and charges" in relation to the "transmission or sale of electric energy," the terms of which the Commission must ensure are "just and reasonable . . . ."  16 U.S.C. § 824d(a).

**2**

Before discussing the specific capacity market at issue in these petitions, it may be useful to lay a foundation by discussing the market-based system more broadly.

Although today electricity is a commodity often bought and sold in a decentralized system, that was not always the case.  In the past, vertically integrated utilities controlled the industry.  *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 4 (D.C. Cir. 2002).  In other words, these utilities singularly owned all services—generation, transmission, and distribution—and sold electricity as a "bundled package" to customers within a specific geographic region.  *Id.* (citation and internal quotation marks omitted).

Congress made the industry more competitive late in the twentieth century with the passage of the Energy Policy Act of 1992 (EPAct).  RICHARD J. CAMPBELL, CONG. RSCH. SERV., RL44783, THE FEDERAL POWER ACT (FPA) AND ELECTRICITY MARKETS 4 (2017).  Under the EPAct, the Commission acquired the authority to force previously exempted vertically integrated utilities to provide transmission services to wholesale generators.  Energy Policy

6

Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776, § 721, 106 Stat. 2776, 2915–16. The Commission exercised this authority in Order No. 888, which required the transmission of wholesale energy to be unbundled from the sale of electricity and mandated that utilities file rates in open-access tariffs to which the utilities were also subject. *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, 61 Fed. Reg. 21,540, 21,547, 21,551–52 (May 10, 1996)[1]; *see also New Eng. Power Generators Ass'n v. FERC*, 757 F.3d 283, 285–86 (D.C. Cir. 2014).

The Commission continued to alter the energy industry after Order No. 888, and in Order No. 2000, it encouraged utilities to join regional transmission organizations. *Reg'l Transmission Org.*, 89 FERC ¶ 61,285 (1999). Among other things, these organizations manage the electricity grid in their respective geographic regions, steady the supply of and demand for energy in those regions, and ensure that the grid remains reliable over the long haul. *Pub. Citizen, Inc. v. FERC*, 7 F.4th 1177, 1186 (D.C. Cir. 2021) (citation omitted). These regional transmission organizations also operate markets for the sale and purchase of electricity.

PJM Interconnection, LLC is one such regional transmission organization, whose geographic reach spans

---

[1] The decision of the Commission is *In re Promoting Wholesale Competition by Public Utilities*, 75 FERC ¶ 61,080, which appears at *FERC Stats & Regs.* ¶ 31,036 (1996). The final rule was published in Order No. 888.

7

thirteen states and the District of Columbia.[2]  PJM administers energy markets where electricity is bought and sold at auctions, but a well-defined tariff (Tariff), approved by the Commission, governs the terms of those auctions.

To ensure that the region maintains an adequate energy supply, PJM hosts capacity market auctions and acquires capacity commitments.  A capacity commitment entails "a commitment to produce electricity or forgo the consumption of electricity when required." *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 659 (D.C. Cir. 2017) (per curiam). Consequently, accepting a capacity market commitment "creates a kind of options contract" between a supplier and a utility. *Id.*  Pursuant to this contract, at a future time when there is high demand, a utility can turn to a capacity supplier to help the utility meet this added demand. *Id.*

In 2006, PJM primarily structured its capacity market to "ensure sufficient resources" by encouraging new service providers to come online, helping secure adequate revenue for suppliers to invest in older facilities, and allocating energy resources to the geographic areas with need.[3]    *PJM Interconnection, LLC*, 117 FERC ¶ 61,331, at PP 3, 6 (2006). To this end, the capacity market established local delivery areas and required that suppliers agree to one-year

---

[2] PJM initially served customers in Pennsylvania and New Jersey, then later Maryland.  Fed. Energy Regul. Comm'n, *Electric Power Markets*, https://perma.cc/Z7C5-U9ZD (last updated May 16, 2023).  PJM has since expanded to other states (discussed above). *See id.* (showing a map of PJM's region).

[3] The capacity market is formally known as the Reliability Pricing Model. *See* J.A. 491–698, Tariff, Attachment DD.

8

commitments beginning three years from when the commitment was formed. Locational delivery, forward-looking contracts, and one-year commitments remain as capacity market features to this day.

**B**

**1**

PJM's capacity market operation is the genesis of the present petition. After having its capacity market in place for several years, PJM approached the Commission in 2014 with concerns about its functioning. Over time, PJM realized that though its market reliably procured commitments, it failed to ensure that suppliers reliably performed their obligations. PJM identified inadequate penalties and diminished incentives for suppliers to invest in facilities as the key problems. It also believed that these deficiencies threatened the reliability of the system and could trigger higher costs for consumers. PJM therefore proposed several significant reforms, which the Commission adopted in 2015 in its Capacity Performance Order.[4]

Among other changes, the Capacity Performance Order implemented a system of penalties and bonuses. Under this system, capacity suppliers who failed to perform when called upon were assessed non-performance charges. Conversely, suppliers who performed to a greater extent than their obligation, or who performed without any prior obligation whatsoever, were compensated with bonuses. PJM paid these bonuses out of revenue from the non-performance charges.

---

[4] The Commission affirmed its decision in a rehearing order issued in 2016.

9

The Commission also incorporated a market-wide default offer cap, which represented a threshold for determining whether an offer required additional review to mitigate a potential exertion of market power.[5] The default offer cap functioned, in large part, like a signal level.[6]  In one direction, supplier offers that came in at or below the default offer cap were automatically accepted, "deemed competitive," and did not require additional review to determine whether the offers complied with the rules of the Tariff.  J.A. 1066, *Indep. Market Monitor for PJM v. PJM Interconnection, LLC*, 176 FERC ¶ 61,137, at P 3 (2021) [hereinafter *IMM v. PJM*][7]; *see also* J.A. 594, Tariff, Attachment DD, § 6.4(a) (explaining that an offer at or below the default offer cap was "not, in and of itself, . . . deemed an exercise of market power . . . .").  In the other direction, offers above the default offer cap became subject to a unit-specific review by PJM and an independent

---

[5] The default offer cap is formally referred to as the Market Seller Offer Cap.  J.A. 594, Tariff, Attachment DD, § 6.4(a).

[6] Another way to think about the default offer cap is like one of the more desired community chest cards in Monopoly. When a player draws one of these fortuitous cards, the player may have the opportunity to "Advance to Go [and] (collect $200)" or gain some other immediate benefit.

[7] The 2015 and 2016 proceedings are designated in this opinion by "*PJM Interconnection LLC*, . . . ." in accordance with the official citation.  The 2021 and 2022 proceedings are designated in this opinion by the abbreviation "*IMM v. PJM*, . . . " in accordance with the Commission citation and tailored to this opinion.

10

monitor (the Independent Market Monitor).[8]   Under unit-specific review, suppliers could justify their above-cap offers with appropriate "data and documentation . . . ."  J.A. 594, Tariff, Attachment DD, § 6.4(b).   PJM then determined whether to accept or reject the supplier's offer.

PJM would continue accepting and rejecting offers, starting with the lowest offer, until it filled its projected future demand for energy.  *Advanced Energy*, 860 F.3d at 659.  Once PJM acquired sufficient capacity to meet that anticipated demand, it then purchased all of the capacity at the price of "the highest accepted [offer]—the market-clearing price."  *Id.* at 660.

The default offer cap was intended to account for a low-cost supplier's "marginal costs, opportunity costs, and risks associated with assuming a Capacity Performance commitment."   J.A. 265, *PJM Interconnection, LLC*, 155 FERC ¶ 61,157, at P 184 (2016).  Marginal costs are reflected in a supplier's avoidable cost rate (ACR), which comprises "the operational costs the resource would not incur in the following year if it did not have a capacity commitment," *Advanced Energy*, 860 F.3d at 666–67, as "expressed in dollars per [megawatt]-year," J.A. 638, Tariff, Attachment DD, § 6.8(a).  An opportunity cost is "the seller's point of indifference between offering in the capacity market and

---

[8]   Market Monitoring Analytics, LLC serves as the Independent Market Monitor for PJM.  In this role, Market Monitoring Analytics acts as a "neutral entity that oversees compliance with PJM's market rules."  *Del. Div. of Pub. Advoc. v. FERC*, 3 F.4th 461, 469 n.7 (D.C. Cir. 2021) (citing *N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 91 n.15 (3d Cir. 2014)).

11

participating as an energy-only resource." [9]  J.A. 265–66, *PJM Interconnection, LLC*, 155 FERC ¶ 61,157, at P 185 (2016). Finally, the risks associated with assuming a capacity commitment include only risks that are "unique to resources with a Capacity Performance obligation . . . ."  J.A. 1256, *IMM v. PJM*, 178 FERC ¶ 61,121, at P 51 (2022).

The Commission also based the default offer cap, in part, on the estimated duration for which a capacity supplier might be called to perform in a future year.[10]  The Commission set this duration to 360 five-minute intervals, known as Performance Assessment Intervals (PAI), which PJM had proposed as an appropriate estimate.[11]  In establishing the cap,

---

[9] Since accepting a capacity commitment might result in penalties for non-performance, energy-only suppliers (who lack a commitment in the first place) had the upside of earning bonuses but no potential downside of incurring penalties.  In another section of the Tariff, an opportunity cost is described as "the documented price available to an existing generation resource in a market external to PJM."  J.A. 637, Tariff, Attachment DD, § 6.7(d)(ii).

[10] Originally, PJM provided the estimated duration in terms of hours (Performance Assessment Hours), which tallied to thirty hours.  PJM later changed this calculation to five-minute intervals (Performance Assessment Intervals), but it did not change the anticipated duration.  To remain consistent with the current term employed in the underlying orders, this opinion uses intervals as the unit of measurement.

[11] PJM calculated the PAI based on the system-wide number of regional transmission organization emergency hours in the 2013/2014 delivery year, which included the anomalous polar vortex.  Delivery years run from June 1 of one year to May 31

12

the Commission believed it had approximated the rate that would be acceptable to a low ACR supplier, which is a supplier "whose avoidable costs are less than its total expected Performance Bonus Payments [if it had to be] an energy-only [supplier]."    J.A. 119, *PJM Interconnection, LLC*, 151 FERC ¶ 61,208, at P 336 (2015).  By contrast, for a high ACR supplier, "the default offer cap w[ould] be too low," because that supplier's avoidable costs would exceed what it could earn in bonus payments.    J.A. 120, *PJM Interconnection, LLC*, 151 FERC ¶ 61,208, at P 339 (2015).  The Commission assumed that a high ACR supplier would thus tender an offer higher than the default offer cap, which would require unit-specific review.    J.A. 120, *PJM Interconnection, LLC*, 151 FERC ¶ 61,208, at P 339 (2015).  Subsequently, the Commission believed, an offer from a high ACR supplier "would set the market clearing price . . . [and] be subject to mitigation" by having its offer set at its net avoidable cost rate.  J.A. 1243, *IMM v. PJM*, 178 FERC ¶ 61,121, at P 25 (2022).

---

of the following year.  PJM then added an additional seven hours as contingency.

The full formula for calculating the default offer cap was the expected performance assessment intervals, times the net cost of new entry divided by the penalty performance assessment intervals (*i.e.*, non-performance charge rate), times the balancing ratio (the average measure of performance in the three years preceding the auction).  J.A. 1234, *IMM v. PJM*, 178 FERC ¶ 61,121, at P 4 & nn.9, 12 (2021); *see also* J.A. 594, Tariff, Attachment DD, § 6.4(a).  This boils down to net cost of new entry (Net CONE) times the balancing ratio (B).  *See* J.A. 594, Tariff, Attachment DD, § 6.4(a).

13

After the Commission adopted the changes in the Capacity Performance Order, suppliers challenged the changes in our Court. We eventually upheld the Commission's Capacity Performance Order implementing the default offer cap and penalty/bonus system. *Advanced Energy*, 860 F.3d at 665–69.

**2**

Six years after adopting the default offer cap, the Commission again addressed questions about PJM's capacity market. In separate complaints, the Independent Market Monitor and Joint Consumer Advocates from various states and the District of Columbia asserted that the expected PAI was inaccurate, leading to a default offer cap that was unjust and unreasonable. Specifically, the Independent Market Monitor and Joint Consumer Advocates asserted that the expected PAI of 360 intervals was "significantly overstated," because "the actual expected number of PAH (PAI) in the energy market is a very small number close to zero . . . ." J.A. 378–79, Complaint of the Independent Market Monitor for PJM, Docket No. EL19-47-000 (Feb. 21, 2019); *see also* J.A. 438, Complaint of Joint Consumer Advocates, Docket No. EL19-63-000 (Apr. 15, 2019). Thus, "the competitive offers of most [capacity market suppliers] [were] not based on the opportunity cost of taking on a capacity performance obligation," as "the opportunity cost [was] below the net avoidable cost . . . ." J.A. 379, Complaint of the Independent Market Monitor for PJM, Docket No. EL 19-47-000 (Feb. 21, 2019).

Concerned about an excessive PAI hindering effective market power mitigation, the Independent Market Monitor and Joint Consumer Advocates called for the Commission to

14

exercise its authority to review the soundness of the expected PAI being employed.  The Commission obliged.

In March 2021, the Commission agreed that 360 PAI was "no longer just and reasonable for PJM to use" because the record showed much lower PAI year after year (the March 2021 Order).  J.A. 364, 365, *IMM v. PJM*, 174 FERC ¶ 61,212, at PP 62, 65 (2021).  Specifically, the Independent Market Monitor's data showed that in 2015, 2016, and 2017 there were zero PAI, and in 2018 there were only twenty-four PAI.  J.A. 348, 355, *IMM v. PJM*, 174 FERC ¶ 61,212, at PP 12, 32 (2021).[12]  Even more, an insufficient number of offers were getting reviewed, because the cap was "higher than or equal to [ninety-nine percent] of offers subject to an offer cap" and fewer than one percent of suppliers chose to submit unit-specific offers that were subject to review.  J.A. 1269, *IMM v. PJM*, 178 FERC ¶ 61,121, at P 80 (2022); J.A. 347, *IMM v. PJM*, 174 FERC ¶ 61,212, at P 10 (2021).  As such, the "excessively high" cap frustrated the Commission's market mitigation efforts, because "PJM and the Market Monitor were not reviewing the offers of the majority of resources that had the potential to exercise market power . . . ."  J.A. 1267**,** *IMM v. PJM*, 178 FERC ¶ 61,121, at P 77 (2022).

---

[12] The Commission order incorrectly states that in 2018 there were "two PAI" when summarizing the Independent Market Monitor's data.  J.A. 348, *IMM v. PJM*, 174 FERC ¶ 61,212, at P 12 (2021).  The Independent Market Monitor's complaint states that "there were 24 five-minute PAIs (equivalent to 2 PAH)" required in 2018.  J.A. 391, Complaint of the Independent Market Monitor for PJM, Docket No. EL 19-47-000 (Feb. 21, 2019).

15

The original default offer cap being no good, the Commission ordered the parties to brief an appropriate replacement rate as well as "alternative approaches," including eliminating the default offer cap altogether. J.A. 368, *IMM v. PJM*, 174 FERC ¶ 61,212, at PP 71–72 (2021). Some capacity market suppliers proposed retaining the default offer cap. These suppliers acknowledged that the PAI was too high, but believed that recalibrating the values used to generate the cap could sufficiently address the problem by bringing suppliers' true costs closer to the cap. Several months later, in its September 2021 Order, the Commission accepted a competing proposal from the Independent Market Monitor that simply eliminated the default offer cap.

The Independent Market Monitor's proposal, the Unit-Specific Avoidable Cost Rate Proposal, increased reliance on the existing unit-specific review process and did away with the default offer cap as a tool for entrance into the market. (This means the signal lever would no longer automatically admit certain offers.) Rather than a default offer cap applying to all suppliers, a supplier's cap would instead be based on an individualized assessment of the supplier's net avoidable costs.[13]    The Commission believed that this shift of

---

[13] Alternatively, suppliers could use the "technology-specific default gross ACRs already defined in the Tariff minus unit-specific energy and ancillary service revenues." J.A. 1235, *IMM v. PJM*, 178 FERC ¶ 61,121, at P 7 (2022). These energy and ancillary service revenues, known as energy and ancillary services offsets, are "an estimate of the net revenues a capacity resource will earn from the energy and ancillary services markets during a given delivery year." J.A. 1235, *IMM v. PJM*, 178 FERC ¶ 61,121, at P 7 n.16 (2022) (quoting *PJM Interconnection, LLC*, 177 FERC ¶ 61,209, at P 45 (2021)); *see also N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d

16

framework would allow suppliers to submit only "offers consistent with their going-forward costs" and act as a counter to potential exertion of market power. J.A. 1236, *IMM v. PJM*, 178 FERC ¶ 61,121, at P 7 (2022).

The Commission's September 2021 Order adopting the Independent Market Monitor's unit-specific proposal canvassed the arguments and proposals of numerous interested parties. In accepting the Independent Market Monitor's proposal, the Commission observed that the proposal would enable PJM and the Independent Market Monitor to sufficiently review offers and "best ensure the capacity market's overall competitiveness . . . ." J.A. 1088, *IMM v. PJM*, 176 FERC ¶ 61,137, at P 61 (2021).

Following the September 2021 Order, suppliers submitted requests for rehearing and clarification, which were denied by operation of law when the Commission failed to act on the requests within thirty days. 16 U.S.C. § 825*l*(a). Notwithstanding this denial, the Commission addressed the issues that the suppliers raised in their requests in a subsequent order a few months later (the February 2022 Order).[14] This February 2022 Order reiterated many of the points the Commission made five months earlier, including

---

74, 108 (3d Cir. 2014) ("'[E]nergy and ancillary services offsets[]' . . . are the expected revenues a new generation resource will likely earn from the sale of energy and ancillary services.").

[14] The Commission refers to this decision as the "Order Addressing Arguments Raised on Rehearing, Addressing Requests for Clarification, and Accepting Compliance Filing." J.A. 1232, *IMM v. PJM*, 178 FERC ¶ 61,121 (2022).

17

that the default offer cap "creat[ed] a serious risk of widespread exercise of market power, which . . . [was] unjust and unreasonable." J.A. 1243, *IMM v. PJM*, 178 FERC ¶ 61,121, at P 24 (2022). The order further explained that unit-specific review based on an individualized assessment could fulfill the intent underlying the 2015 Capacity Performance Order: that "the resource whose offer would set the market clearing price would be subject to mitigation if the seller had market power, and have its offer set at Net ACR." J.A. 1243, *IMM v. PJM*, 178 FERC ¶ 61,121, at P 25 (2022).

## II

Aggrieved by the Commission's rulings, Petitioners filed petitions for review in our Court, which we consolidated.[15] Petitioners seek review of the Commission's September 2021 Order (adopting the Unit-Specific Avoidable Cost Rate Proposal), November 2021 Notice (denying by operation of law Petitioners' requests for rehearing and clarification, but intending for a forthcoming order to consider the issues Petitioners raised), and February 2022 Order (addressing the issues raised in the requests for rehearing and clarification).[16]

---

[15] This dispute involves six consolidated petitions for review, filed separately between November 2021 and April 2022. Upon order from our Court, Petitioners filed joint opening and reply briefs, and were jointly represented by counsel at oral argument.

[16] Petitioners filed timely petitions for review following the Commission's denial of their requests for rehearing and clarification. Petitioners then amended those petitions after the Commission issued its February 2022 Order addressing issues raised in the requests for rehearing. In April 2022, our Court instructed the parties to "address in their briefs whether

18

We review these orders under a well-known standard asking whether the Commission's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A); *see also PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 207–08 (D.C. Cir. 2011). Though deferential, this standard still

---

new petitions for review, rather than amended petitions, [were] required to obtain review of [the Commission's] February 18, 2022 order addressing arguments raised on rehearing." ECF, April 13, 2022; *see also* ECF, May 16, 2022 (directing the parties to address standing and "raise all issues and arguments in the opening brief"). Thereafter, Petitioners filed new petitions for review addressing the Commission's February 2022 order before the statutory deadline for seeking review expired. *Constellation Energy Corp. v. FERC*, No. 22-1063 (docketed Apr. 14, 2022); *Elec. Power Supply Ass'n v. FERC*, No. 22-1065 (docketed Apr. 18, 2022); *Vistra Corp. v. FERC*, No. 22-1066 (docketed Apr. 19. 2022). These briefs are now before us, ECF, June 13, 2022, and Sept. 23, 2022; *see also* Petitioners' Br. 18 n.5 (discussing this Court's orders), 22–23 (addressing standing), and we have jurisdiction to review the new petitions, *see* 16 U.S.C. § 825*l*(b). Further, though not contested by the Commission, we also have authority to review these petitions under Article III of the Constitution of the United States. Petitioners would suffer economic harm if they were required by the Commission's decisions to sell capacity at a price lower than they believe economical, that requirement could be fairly traceable to the Commission's decision, and we could potentially redress it by order of this Court. *Exelon Corp. v. FERC*, 911 F.3d 1236, 1240 (D.C. Cir. 2018).

19

demands that the Commission "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  We also require that the Commission "respond meaningfully" to alternative proposals raised in its proceedings.  *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001).

**III**

Petitioners assert three challenges to the Commission's orders.[17]  First, Petitioners argue that the Commission's actions were arbitrary and capricious when it discarded the default offer cap without explanation, and failed to address the reasonable alternatives they presented to avoid jettisoning the cap.  Next, Petitioners argue that the Commission failed to meaningfully account for supplier concerns that capacity offers must adequately reflect the risks suppliers undertake when they participate in capacity market auctions.  Finally, Petitioners argue that, under the current setup, the Independent Market Monitor's role tramples on the Section 205 rights of suppliers to set their own rates.  We review, and reject, each of these contentions in turn.

**A**

To begin, agencies are the experts in their designated subject areas.  As an expert in energy regulation, the

---

[17]  Petitioners do not challenge the Commission's determination that the PAI was too high.  *See* Oral Arg. Tr. 11:24–12:2.

20

Commission has the "technical understanding" necessary to carry out its congressionally delegated duties. *Elec. Power Supply Ass'n*, 577 U.S. at 295. We must only confirm that "the Commission engaged in reasoned decision[]making"; specifically, that the Commission "weighed competing views, selected [an option] with adequate support in the record, and intelligibly explained the reasons for making that choice." *Id.* Petitioners argue that the Commission neither adequately explained its approach and purported departure from prior findings, nor did the Commission address Petitioners' alternative proposals that could have retained the default offer cap. For the reasons below, Petitioners are incorrect.

**1**

In electing to adopt the Independent Market Monitor's proposal, which increased reliance on unit-specific review, the Commission adequately explained its decision.[18] As the Commission noted, "one way to measure the effectiveness of seller-side market power mitigation is whether the marginal offer [gets] reviewed." J.A. 1088, *IMM v. PJM*, 176 FERC ¶ 61,137, at P 62 (2021). (The marginal offer is the one that sets the market-clearing price.) The Commission stated that reliance on unit-specific review "should ensure that the

---

[18] Yet, the adopted proposal also allows suppliers to incorporate certain default values, namely default gross ACR values, as an alternative to unit-specific review, because these values are "just and reasonable estimates as part of a competitive offer." J.A. 1088, *IMM v. PJM*, 176 FERC ¶ 61,137, at P 63 (2021). Unlike the market-wide default offer cap, the Commission believes this individualized offer cap represents "a reasonable estimate of a competitive capacity offer for that [particular supplier] . . . ." J.A. 1089, *IMM v. PJM*, 176 FERC ¶ 61,137, at P 63 (2021).

21

marginal offer is reviewed," something that the default offer cap failed to accomplish. J.A. 1088, *IMM v. PJM*, 176 FERC ¶ 61,137, at P 62 (2021). This decision to eliminate the default offer cap was profoundly rational since the formula for determining the cap had led to ninety-nine percent of offers being equal to or higher than the cap itself. The logic behind the Commission's action is underscored by the fact that the recalibrated default offer cap proposed by Petitioners reshuffled some numbers but maintained the then-existing default offer cap. These specific proposals did not lower the default offer cap and would have still led to an inappropriately high number of offers avoiding review (discussed further below).

We note the Commission plainly told Petitioners that eliminating the default offer cap was a possibility. In the March 2021 Order, the Commission expressly directed the parties to brief: (a) "the appropriate replacement rate," and (b) "whether an alternative method . . . would better address the concern[s]" raised. J.A. 368, *IMM v. PJM*, 174 FERC ¶ 61,212, at P 72 (2021). Indeed, the Commission specifically requested briefing on the soundness of "remov[ing] the market-wide default market seller offer cap and instead employ[ing] unit-specific offer caps for all [suppliers]" who fail the Market Structure Test.[19] J.A. 368, *IMM v. PJM*, 174 FERC ¶ 61,212, at P 72 (2021). The decision to discontinue the market-wide default offer cap was, therefore, contemplated in the directive to brief it as a possible alternative to merely recalibrating the default offer cap.

---

[19] The Market Structure Test is a method to determine whether a supplier has market power. PJM regards a supplier to have market power if the supplier fails this test.

22

Petitioners seemingly assert that the Commission was limited to only "adjusting" the PAI because statements in the 2015 Capacity Performance Order encouraged PJM to revisit the estimated PAI and submit a new number if warranted. Petitioners' Br. 29–30. But these statements did no such thing. The PAI established in 2015 turned out to be an overly abundant estimate, perhaps even doomed from the start.[20] Moreover, the Commission can change its approach when a change of direction is acknowledged and fully explained, as here. Therefore, the seeming assertion that adjusting the default offer cap was all that the Commission could do is unavailing.

**2**

As a secondary argument, Petitioners assert that the Commission acted arbitrarily and capriciously because it failed to address reasonable alternative proposals. We disagree.

In its September 2021 Order, the Commission methodically outlined the Independent Market Monitor's unit-specific proposal, discussed the challenges to that proposal, and examined competing proposals by other parties. J.A. 1068–72, *IMM v. PJM*, 176 FERC ¶ 61,137, at PP 8–17 (2021) (Independent Market Monitor's proposal and opposition to it); J.A. 1072–76, *IMM v. PJM*, 176 FERC ¶ 61,137, at PP 18–26 (2021) (PJM's proposal and opposition to it); J.A. 1076–78, *IMM v. PJM*, 176 FERC ¶ 61,137, at PP 27–33 (2021) (Joint Consumer Advocates' proposal and opposition to it); J.A. 1078–81, *IMM v. PJM*, 176 FERC ¶ 61,137, at PP 34–42 (2021) (Suppliers' proposals and

---

[20] Remember, this estimate included the anomalous Polar Vortex plus additional hours as contingency.

23

opposition to these proposals).  As relevant to these petitions, the Commission examined the efficacy of Petitioners' proposal to merely revise the default offer cap rather than eliminate it, and found that approach wanting.

The Commission concluded that it was "difficult" to estimate an expected PAI that could "apply broadly to all sellers" as opposed to determining estimates for individual suppliers.  J.A. 1092, *IMM v. PJM*, 176 FERC ¶ 61,137, at P 71 (2021).  Indeed, retaining the default offer cap, as Petitioners desired, did not address the Commission's earlier findings regarding the potential for market power exertion. The proposals from suppliers to retain the existing default offer cap by lowering the PAI and increasing the penalty rate would leave the market power concern unaddressed, because the default offer cap would be unchanged and thus still too high.  The Commission also explained how proposals from the other oversight agencies were similarly less favorable than the Independent Market Monitor's proposal.  For instance, the Commission noted that the proposals from PJM and the Joint Consumer Advocates would result in fewer offers being reviewed and provided less certainty that the marginal offer would be reviewed.  Further, the PJM and the Joint Consumer Advocates proposals relied on historical auction rates.  As a result, weakened mitigation in the past could be carried forward in subsequent auctions, but "[t]he Unit-Specific ACR Proposal d[id] not have this drawback."  J.A. 1090, *IMM v. PJM*, 176 FERC ¶ 61,137, at P 65 (2021).

We believe that these explanations of its decision to adopt the Independent Market Monitor's proposal, including

24

stated reasons for declining alternative proposals, show that the Commission acted neither arbitrarily nor capriciously. [21]

**B**

Petitioners next assert that the Commission failed to meaningfully address the suppliers' concerns about offer values adequately reflecting the risks suppliers undertake as capacity market participants. On this issue, Petitioners' arguments mirror contentions that were raised at the agency level by others in opposition to the Commission's 2015 Capacity Performance Order. [22]    *See* J.A. 272, *PJM*

---

[21] The Commission addressed other implications of its decision as well, including: potential administrative burdens and unworkability; over-mitigation; the means for suppliers to dispute disagreements with the Independent Market Monitor and PJM; and whether the Commission needed to change the unit-specific review process before eliminating the default offer cap. J.A. 1090–93, *IMM v. PJM*, 176 FERC ¶ 61,137, at PP 66–73 (2021). The Commission appropriately determined that these concerns were either unfounded or constituted a reasonable burden for the affected parties. *Id.*

[22] We affirmed the Capacity Performance Order in our *Advanced Energy* decision. *See Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656 (D.C. Cir. 2017). The petitioners in *Advanced Energy* do not appear to have raised in our Court the energy-market costs arguments asserted now by Vistra and the accompanying suppliers in these petitions, despite these contentions having been raised before the Commission when the 2015 Capacity Performance Order was challenged at the administrative level. *Compare* J.A. 272, *PJM Interconnection, LLC*, 155 FERC ¶ 61,157, at P 203 (2016), *with* Joint Opening Brief of Petitioners, *Advanced Energy*

25

*Interconnection, LLC*, 155 FERC ¶ 61,157, at P 203 (2016). To the extent that Petitioners challenge something new, it is their alleged inability to "submit an offer based on the opportunity cost of forgoing bonus payments that it could receive in the PJM market." Petitioners' Br. 27. For the reasons explained below, the Commission suitably addressed Petitioners' concerns, so we reject this ground for relief.

**1**

Petitioners claim that suppliers need a certain level of "flexibility" to account for the inherent risks of capacity market participation, and that the Commission's prior course permitted the "flexibility to include various risks in their offers, so long as the offers remained below the cap." Reply Br. 17. By way of example, Petitioners identified alleged risks associated with liquidated damages, unanticipated outages, labor disputes, lower energy revenues, weather, supply chain restrictions, and unit performance. They assert that these other risks must be incorporated into their capacity market offers, otherwise they miss out on an opportunity to make money. As for risks not unique to the capacity market, Petitioners' demands have been thrice addressed—and thrice disapproved—by the Commission.[23] We do the same.

---

*Mgmt. All. v. FERC*, 860 F.3d 656 (D.C. Cir. 2017) (Nos. 16-1234, 16-1235, 16-1236, and 16-1239), 2017 WL 105811; *see also* Oral Arg. Tr. 19:6–25:9.

[23] The Commission addressed these exact issues in 2016, 2021, and 2022. J.A. 272, *IMM v. PJM*, 155 FERC ¶ 61,157, at P 203 (2016); J.A. 1092–93, *IMM v. PJM*, 176 FERC ¶ 61,137, at P 72 (2021); J.A. 1256, *IMM v. PJM*, 178 FERC ¶ 61,121, at PP 50–51 (2022).

26

As clear as day, the Commission's prior orders expressly stated that energy-market risks were "not intended to [be] permit[ted]" in capacity market offers, because such risks are already generally assumed by all PJM market participants. J.A. 272, *PJM Interconnection, LLC*, 155 FERC ¶ 61,157, at P 203 (2016); *see also id.* (explaining that "volatile energy prices . . . should not be an element of a cost-justified offer" under the adopted rules). The Commission reasoned that a supplier's ACR calculation "should reflect the cost of accepting [and performing] a capacity obligation" specifically, rather than the cost of energy-market participation generally. J.A. 1256, *IMM v. PJM*, 178 FERC ¶ 61,121, at P 51 (2022); *see also* J.A. 272, *PJM Interconnection, LLC*, 155 FERC ¶ 61,157, at P 203 (2016). The September 2021 Order merely reiterated the Commission's earlier limitations on what suppliers could include in their offers, and Petitioners failed to provide reasons demonstrating that the Commission's prior conclusions were no longer appropriate. [24]

The Commission also expressed its apprehension that allowing suppliers to "price every possible adverse outcome" would "unreasonably shift all risk" from suppliers to consumers, "effectively holding sellers harmless at the expense of ratepayers." J.A. 1093, *IMM v. PJM*, 176 FERC ¶ 61,137, at P 72 (2021). Yet, the Commission nonetheless

---

[24] *See* J.A. 1092–93, *IMM v. PJM*, 176 FERC ¶ 61,137, at P 72 (2021); *see also* J.A. 1253–54, *IMM v. PJM*, 178 FERC ¶ 61,121, at P 47 (2022) (explaining that "the scope of risks adopted in the Capacity Performance Order continues to strike a reasonable balance by protecting consumers . . . [yet allowing] risks that are quantifiable, reasonably supported, and attributable to the seller's capacity obligation under Capacity Performance in a seller's unit-specific offer cap[]").

27

declined to outline an "exhaustive" list of costs that suppliers could factor.   J.A. 1257, *IMM v. PJM*, 178 FERC ¶ 61,121, at P 51 (2022).    Instead, it provided the flexibility that Petitioners assert is lacking.    As communicated in the February 2022 Order, costs associated with capacity performance (including risk management strategies) may be included in offers, as long as a supplier "reasonably supports and quantifies such costs."   J.A. 1257, *IMM v. PJM*, 178 FERC ¶ 61,121, at P 51 (2022).

**2**

Finally, Petitioners argue that the Commission never explained why, under the adopted proposal, suppliers could not account for missed bonus opportunities.    Yet, the Commission's motivation to cease using the default offer cap illuminates why excluding bonuses as a given factor in offers was neither arbitrary nor capricious.

The Commission determined that the default offer cap was unjust and unreasonable, because 360 PAI was a "gross[]" overestimate of the number of the intervals that a supplier could expect to perform.   Oral Arg. Tr. 38:1. This unjust and unreasonable cap was based, in part, on lost opportunities to earn bonuses by outperforming a contracted commitment, or performing without any prior obligation to do so.   *Advanced Energy*, 860 F.3d at 667.   These bonuses were slated to come out of the penalties assessed against non-performing suppliers.   Though that was the plan, there were essentially no bonuses paid in the years following adoption of the default offer cap, because "there were almost no [PAI]"

28

where suppliers were called to perform.[25]  Oral Arg. Tr. 38:2–3.

This lack of PAI is important, because "under low PAI, the opportunity to earn bonuses is reduced, and the likelihood of earning bonuses enough to exceed the avoidable costs is also reduced."  J.A. 400, Complaint of the Independent Market Monitor for PJM, Docket No. EL19-47-000, Att. A (Feb. 21, 2019).  The record before the Commission showed decidedly low PAI—near zero.  The low PAI decreased the likelihood of suppliers earning bonuses sufficient to exceed their avoidable costs.  As such, the Commission's decision to rely on a different approach, which excluded the nearly non-existent bonus payments as a given component of offers via a default offer cap, appears to be a rational choice.[26]

---

[25] J.A. 705, Brief of Independent Market Monitor for PJM, Docket No. EL19-47-000 (Apr. 28, 2021) ("The only PAI since PJM implemented Capacity Performance in 2016, for which PJM assessed nonperformance charges and paid performance bonus payments, were on October 2, 2019, for 24 intervals, or two hours.").

[26] Moreover, that the risk of non-performance charges remains an explicitly permissible factor in determining a unit's avoidable cost rate is similarly rational.  Penalties are static and can be estimated *ex ante* with greater ease and accuracy than bonus payments.  The Commission "set[s] the penalty rate at a level that would require resources that fail to perform" any portion of their capacity commitment when called upon "to pay the expected full cost of replacement capacity for that period."  J.A. 60, *PJM Interconnection, LLC*, 151 FERC ¶ 61,208, at P 159 (2015).  Therefore, resources can calculate the potential penalties they might incur "before they submit their offers."  J.A. 60–61, *PJM Interconnection,*

29

Accordingly, because the Commission reasonably explained its decision as to the factors that suppliers may include in capacity market offers, we deny this second ground for relief.

## C

Petitioners' final contention concerns the right of suppliers to set their own rates under Section 205 of the Federal Power Act. Petitioners and the Commission dispute whether offers in capacity market auctions are "rates" that suppliers may set on their own terms, or mere "inputs" used to determine the ultimate rate. Petitioners' Br. 46; *cf.* Respondent's Br. 29. Petitioners claim that the plain text of Section 205 supports their view of offers as "rates . . . demanded" within the scope of the statute. Petitioners' Br. 46. Further, according to Petitioners, the Commission's new approach guts a key feature of Section 205 because the Independent Market Monitor can challenge a supplier's offer, and PJM might accept the Independent Market Monitor's suggested offer instead. For the reasons below, Petitioners:

---

*LLC*, 151 FERC ¶ 61,208, at P 160 (2015). Those numbers "allow[] for some degree of certainty before the capacity auction" and provide a "basis to assess risk . . . ." J.A. 60–61, *PJM Interconnection, LLC*, 151 FERC ¶ 61,208, at P 160 (2015). In contrast, actual bonus payouts to any single supplier can vary based on the surrounding circumstances, if they are paid at all. *See Advanced Energy*, 860 F.3d at 667. By excluding the variable (and effectively illusory) factor as a guaranteed component of offers, the Commission furthers its goal of ensuring that just and reasonable rates ultimately emerge from the capacity market auctions.

30

(1) misconstrue the regulatory program at issue, and (2) incorrectly conclude that capacity market offers are "rates" within the meaning of Section 205.

**1**

Section 205 of the Federal Power Act "covers rate filings by jurisdictional public utilities" and imposes a "just and reasonable standard[]" on those filed rates. *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 352 (D.C. Cir. 2014) (quoting *Ala. Power Co. v. FERC*, 993 F.2d 1557, 1571 (D.C. Cir. 1993)). The Commission may investigate whether rates meet this just and reasonable requirement, but suppliers still have a right to set their rates in the "first instance." *Id.* at 353 (appearing in the quotation from *Bos. Edison Co. v. FERC*, 233 F.3d 60, 64 (1st Cir. 2000)); *see also* 16 U.S.C. § 824e. Petitioners claim that under the unit-specific review model, the Independent Market Monitor's alternative proposal receives "precedence" if the Independent Market Monitor disagrees with a supplier's offer. Petitioners' Br. 46–47. The Commission, PJM, and the Joint Consumer Advocates disagree with this claim. We do too.

Undoubtedly, the Independent Market Monitor plays a central role in overseeing PJM's capacity market. Yet, even though suppliers and the Independent Market Monitor may submit differing proposals under unit-specific review, the Independent Market Monitor's proposal does not automatically displace an offer submitted by a supplier. Instead, PJM plays the primary role of determining which offer makes it to market.

The 2015 Capacity Performance Order established the unit-specific review process at issue in these petitions, and that process involves several steps. First, suppliers submit

31

their capacity market offers to PJM and the Independent
Market Monitor within a specified timeframe before the
auction. These offers must be supported by adequate "data
and documentation . . . ." J.A. 594, Tariff, Attachment DD,
§ 6.4(b). Next, after addressing any concerns raised by the
Independent Market Monitor and attempting to reach an
agreement on an appropriate offer, a supplier must notify PJM
regarding whether it and the Independent Market Monitor
have, in fact, reached an agreement. *See* J.A. 594–95, Tariff,
Attachment DD, § 6.4(b).

If the Independent Market Monitor and a supplier cannot
agree, the supplier may still submit its offer and supporting
data to PJM, which PJM then reviews independently. PJM,
alone, decides "whether to accept or reject the requested unit-
specific" offer. J.A. 595, Tariff, Attachment DD, § 6.4(b).
Though, even if PJM rejects a supplier's offer as incompatible
with the Tariff and chooses to set the offer at the price
proposed by the Independent Market Monitor, suppliers are
not without recourse. The parities do not contest that, under
the Tariff, nothing in the review process "precludes
[suppliers] from filing a petition with [the Commission]
seeking a determination" that their offers comply with the
Tariff and therefore should be permitted into the auction. J.A.
595, Tariff, Attachment DD, § 6.4(c); *see also* J.A. 1091,
*IMM v. PJM*, 176 FERC ¶ 61,137, at P 67 (2021) ("[A]s
provided in the Tariff, should a dispute arise between a seller
and the Market Monitor, a seller may seek Commission
action.").

The September 2021 Order did not change the
Independent Market Monitor's role as described above. J.A.
1092, *IMM v. PJM*, 176 FERC ¶ 61,137, at P 72 (2021)
("After reviewing the comments about the unit-specific
review process, we are not convinced that any changes need

32

to be made to the process to implement the Unit-Specific ACR Proposal."); *see also* J.A. 36, *PJM Interconnection, LLC*, 151 FERC ¶ 61,208, at P 93 (2015) ("We disagree with the Market Monitor's argument that, in addition to PJM's authority to review and, as appropriate, reject the sell offer of a Capacity Performance Resource, the Market Monitor should also be given the authority to reject an offer.").  PJM likewise explained to this Court that PJM "adopts the Market Monitor's proposed calculation only if PJM first determines that the [supplier's] calculation does not comply with the Tariff' and it also approves the Independent Market Monitor's proposal.  PJM Intervenor's Br. 2.

To summarize the interaction, suppliers can submit their offers to PJM regardless of the Independent Market Monitor's views, then ask the Commission to referee if a dispute persists.  As such, the current Tariff and September 2021 Order make quite clear that suppliers do not play second fiddle when their proposed offers deviate from that of the Independent Market Monitor.

**2**

Petitioners similarly misperceive the nature of their submissions into the capacity market.  According to Petitioners, capacity market offers are "rates and charges made, demanded, or received" within the meaning of Section 205.  Petitioners' Br. 47 (quoting 16 U.S.C. § 824d(a)).  The Commission counters that: (i) suppliers have voluntarily agreed to abide by the terms of the Tariff, which includes a unit-specific review process, and (ii) capacity market offers are not "rates" under Section 205.  We think the Commission's second argument is persuasive.

33

Under *Chevron*, we review the Commission's interpretation of the Federal Power Act following a two-step approach. *W. Minn. Mun. Power Agency v. FERC*, 806 F.3d 588, 591 (D.C. Cir. 2015) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)). The first question is always "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842–43. Where Congress's intent is clear and unambiguous, "that is the end of the matter[.]" *Id.* But where Congress's intent is not so easily perceived, "the [second] question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Yet, we need not reach that second question, because the traditional tools of statutory interpretation available to us show that the Commission's reading best accords with "[t]he statute's plain text . . . ." *Bauer v. Fed. Deposit Ins. Corp.*, 38 F.4th 1114, 1121 n.2, 1122–23 (D.C. Cir. 2022).

Section 205 does not expressly define the term "rate."[27] Yet, Petitioners' requested reading of offers as "rates . . .

---

[27] Our case law, taken as a whole, also provides little instruction. At times, we have referred to capacity market submissions as "rate[s]." *Advanced Energy*, 860 F.3d at 659 ("Resource owners offer to sell a set amount of capacity at a specific rate."). At other times, we have referred to capacity market submissions as "prices." *Pub. Citizen*, 7 F.4th at 1193 ("[I]n conducting that active monitoring, the Commission examines auction prices . . . ."). We have also called them "bids." *New Eng. Power Generators Ass'n*, 757 F.3d at 287 (discussing how a market monitor reviews the capacity market "bids" for auctions run by a similar regional transmission organization). Still, in some circumstances, we have referred to a submission as a "rate," "price," and "bid," all within the same paragraph. *Advanced Energy*, 860 F.3d at

34

demanded" would not seem to comport with the statute itself. Petitioners' Br. 46. Section 205(c) requires that rate schedules be "file[d] with the Commission" and "ke[pt] open . . . for public inspection . . . ." 16 U.S.C. § 824d(c). By contrast, offers into capacity market auctions are confidential and submitted to PJM, not the Commission. Moreover, the Commission does not need to review offers submitted into the auction for justness and reasonableness, *Pub. Citizen*, 7 F.4th at 1193, though the Federal Power Act mandates that the Commission review Section 205 rates for such compliance, *NextEra Energy Res., LLC v. FERC*, 898 F.3d 14, 20 (D.C. Cir. 2018). Thus, unlike Petitioners' view, the Commission's reading that offers are not rates within the meaning of Section 205 is entirely consistent with the statute.

Our decision in *Public Citizen* bolsters the Commission's interpretation. *Public Citizen* clarified that "rates" as used in Section 205 are the open-access transmission tariffs produced by the auction, not the predicate "auction prices" submitted into the market. *Pub. Citizen*, 7 F.4th at 1194. Under the view taken in *Public Citizen*, capacity market offers cannot be the same as the "rates" referred to in Section 205, because capacity offers are not reviewed by the Commission to determine whether they are "intrinsically just and

---

659–60 (discussing suppliers setting their submissions "at a specific rate," but PJM ultimately purchasing capacity "at the rate of the highest accepted bid" "[r]egardless of the [supplier's] offer price"). In this opinion, we refer to capacity market submissions as "offers." *See supra*; *see also Del. Div. of Pub. Advoc.*, 3 F.4th at 463 ("To establish the capacity market, PJM conducts a yearly auction in which electricity suppliers submit offers to be available to provide capacity during a one-year period, three years in the future.").

35

reasonable . . . ." *Id.* at 1193 ("But in conducting that active monitoring, the Commission examines auction prices not to determine whether the prices themselves are intrinsically just and reasonable, but instead 'to ensure that the reported transactions are consistent with the data expected of a competitive, unmanipulated market.'") (quoting *Mont. Consumer Couns. v. FERC*, 659 F.3d 910, 919 (9th Cir. 2011)).

With that said, because the Commission provides a sensible interpretation of offers as inputs into the capacity market rather than "rates" under Section 205, and our own precedent accords, we reach the same conclusion as the Commission: capacity market offers are not "rates" within the statutory meaning of Section 205; they are inputs into determining the market-clearing price.

## IV

At this point, we can end our review. The Commission did not act arbitrarily or capriciously when it eliminated the default offer cap in favor of reliance on unit-specific review, and it explained its reasons for doing so while responding to calls for it to adopt alternative proposals. The Commission also provides a reasonable textual interpretation of rates as inputs into final offers, which accords with our prior precedent. We therefore deny these petitions.

*So ordered.*